The next matter, number 181108, I'm sorry, number 181165 and number 181166, Assured Guaranty Corporation at all versus the Commonwealth of Puerto Rico at all. If the court please, Mark Ellenberg on behalf of the appellants, your honor with your consent I would like to reserve three minutes for a while. Thank you. In its recent PREPA decision, this court said, quote, secured creditors should not be left to stand by helplessly as the debtor spent the creditor's collateral, end of quote. Your honor, we're here this morning for precisely the same reason. The consequence of the district court's decision is to let debtors continue to dissipate hundreds of millions of dollars of our collateral while we stand helpless. This case, in fact, is even stronger than PREPA. Congress specifically amended Chapter 9 in 1988 to prevent exactly the situation that is now before the court. Known as the special revenue provisions, the 1988 amendments were designed to reverse the negative impact on municipal revenue bond market that occurred in 1978 when the original Chapter 9 was enacted. Municipal revenue bonds, like those before the court, are the most common form of municipal financing. The bonds are secured by a pledge of future revenues and it has to be future revenues, for example, revenues produced by a project such as tolls or certain dedicated excise taxes because state law prohibits the granting of a lien on the hard assets that have immediate value. You can't get a lien on the subway. You can't get a lien on the toll road. You never get a lien on City Hall. And so the only way to secure obligations, if you choose to secure them, is to grant a lien on a future stream of revenues. That is municipal financing 101. Before 1988, municipalities struggled to issue new revenue bonds. Cleveland, in particular, had a problem where, in the wake of the new bankruptcy code, it was unable to issue new bonds in 1979. And Congress responded to that concern by the 1988 amendments. And in particular, they added Section 922D and Section 928A, again, specifically to address those concerns. Section 922D ensures that a municipality will continue, during the case, to apply special revenues, again, during the bankruptcy case. Not after, not in a planned confirmation, during the case. That is the exact focus of 922D. Is anything that you're saying inconsistent with what I take to be the view of the bankruptcy judge, that these are asymmetrical provisions that they simply will allow the municipalities to apply as opposed to granting some rights in your clients? Yes. Okay. So, yes. Absolutely, Your Honor. Congress was not concerned with granting an option to the debtor so that the debtor might continue if it chose to. Quite to the contrary, Congress was concerned, absolutely, with an interruption of payments on municipal revenue bonds. Indeed, page 21 of the Senate report, Joint Appendix 568, says, reasonable assurance of timely payment is essential to the orderly marketing of municipal bonds and notes and continued municipal financing. So, Congress was concerned, absolutely, about timely payment continuing during the pendency of the case. It was not a question of, well, the debtor could do it if it wants to. Moreover, Your Honor, the notion that the automatic state... Actually, I don't think you... You haven't said anything that suggests that that's true. So far, at least I haven't heard it. Your Honor, if the debtor only has the option, they can do exactly what they're doing in this case, which is not pay us. In fact, they're taking $350 million a year of our collateral and sending it up to the Commonwealth where it's going who knows where. It's certainly not going to us. You're the insurance company representing, insuring the bondholders, are you not? That's correct, Your Honor. All of the appellants here are monoline insurance companies. And what is the statutory basis of your cause of action? What gives you a cause of action in this case? Your Honor, we guarantee the timely payment of interest and principal on these bonds as they become due. We will be here for the next 50 years paying interest and principal on these bonds. We have already paid millions of dollars in claims because of missed principal and interest payments. And every time we do that, we subrogate to the rights of the bondholders. Moreover, our contracts give us the rights to assert claims on behalf of the bondholders in situations just like this. There has never been any question raised below or in the briefing here about our ability to be here today arguing these points. So, Judge Howard, again, the whole point of Section 922D and 928 was continuity, that payments had to continue mandatorily to the extent that the pledged revenues were adequate to fund the payments. The basic deal that revenue bondholders make is that they will accept the pledge and they will hope that the pledged revenues are adequate to support the payments that need to be made over the 20, 30, 40, 50-year duration of the bonds. They give up recourse to the full faith and credit of the municipality. The GEO bondholders have that recourse to full faith and credit. Municipal revenue bondholders give up that recourse and their only source of repayment is from these proceeds and so from the pledged revenues. And so, if that pledge and the flow of that pledge in accordance with state law, which is a key point here, if the flow in accordance with state law is interrupted, they have no other source of payment. Their source of payment is gone and that would make these bonds impossible to market and that's exactly what happened to Cleveland in 1979 and that's why Congress amended the statute. They were not interested in giving the debtor an option. They were interested in creating certainty so these bonds could be argued and so that municipalities could stay out of Chapter 9 by having continued access to the capital markets. Your Honor, there's a clear tension between the freedom of municipality in Chapter 9 once it's in Chapter 9 to act and the ability of a municipality to stay out of Chapter 9 by continuing to access the capital markets. The 1988 amendments are Congress's attempt to strike that balance and they struck it in favor of preserving the capital market access to the extent of Section 922D and 928. And it's noteworthy that Section 101 of PROMESA actually echoes that same desire. Section 101 says the purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets. What Congress understood is that you cannot have fiscal responsibility without access to the capital markets or vice versa. And the decision below effectively gutted the 1998 amendments and Chapter 9 and frustrated PROMESA's stated goal of restoring access to the capital markets by failing to even let us go to another court, Section 922D at a minimum clearly does, to let us enforce our rights at state law. And again, the key point here is every day that they sweep our collateral to other places for uses that are not consistent with the statutes and resolutions that govern these bonds, they are violating not only 922D and 928, they are violating the law of Puerto Rico. Every time they do that, they are violating the law of Puerto Rico. Because the law of Puerto Rico is very clear that the proceeds that have been pledged to us must be delivered to HTA and can only be used to pay these bonds to the extent that bonds need to be paid. Once the bonds are paid, then the funds can drop down and be used by HTA for other purposes. But by the law of Puerto Rico, the use of these taxes, the use of the toll revenues is expressly restricted. They are violating that law every single day. And it is ironic that they are using Section 305 of the Bankruptcy Code to justify the breaking of the law of Puerto Rico. Because the entire purpose of Section 305 is to the contrary. I think it's a basic misunderstanding of 305 that is pervading this case like a cancer. Section 305 does not serve the goals of Chapter 9 or the Bankruptcy Code. 305 was put in reluctantly by Congress after the Supreme Court struck down the prior version of Chapter 9 in the Ashton case for violating the Tenth Amendment. It was only to preserve the code against attack under the Tenth Amendment that Section 305 was added. And so the purpose of 305 is to defend the sovereignty of the states who would be municipal debtors. That sovereignty includes not only the executive branch, but the legislative branch. The purpose of 305 was to protect state law from interference by the Bankruptcy Code. Congress never envisioned that the debtors would do what they're trying to do here, which is to use Section 305 as a sword to justify the violation of state law. I'm sorry, but 305 doesn't seem to read the way you seem to interpret it. It says, the court may not, and I'm only reading part of it, by any state order or decree, in the case or otherwise, interfere with, one, the political or governmental powers of the debtor, any of the property or revenues of the debtor, or, three, use, the use or enjoyment by the debtor of any income-producing property. Seems to me that language is fairly clear. It doesn't seem to comport with what you've been arguing. I respectfully disagree, Your Honor. Again, respectfully, I believe that you are. First of all, the legislative history is quite clear. Why do we have to go to legislative history with clear language? So let's start with the language, Your Honor. There is no interference in this case because the law of the Commonwealth expressly limits the debtor's use of this property. So if what the district court did were to order that the Commonwealth must apply the pledged revenues in accordance with Commonwealth law, there would be no interference because their right to those funds is inherently limited by the law of the Commonwealth. The very statutes that create the taxes impose limitations on the use of those taxes. They're very clear about that. That is the law of Puerto Rico. And so when you say to the debtor, you must follow the law of Puerto Rico, you are not interfering with anything. You are telling them to do what the law of Puerto Rico says you should do, and that is exactly what Section 305 was intended to accomplish. And to the extent you find my plain language reading, Your Honor, inconsistent with yours, I suggest the legislative history is very much on my side. I'll look into it. Thank you, Your Honor. I'd also like to address the notion that Section 922d was needed at all to permit the debtor to pay claims voluntarily, quote, unquote. First of all, there is nothing in the plain language of the statute that suggests it's so limited. Indeed, Section 922d starts out by accepting the application of funds to pledged revenues to pay municipal bonds from the entirety of Section 922a and the entirety of Section 362a. First of all, when you look at what is prohibited in 362a and 922a, it is only actions by creditors. There is no debtor conduct to be found in either 922a or 362a. Moreover, if the intent was to permit, for example, self-help so that a creditor who already had funds in its possession could take them, then all you would have to have done was reference Section 362a-7, which governs set-off and thus permits self-help. The statute doesn't do that. It includes all of 922a and 362a without exception. Moreover, what is the purpose of 928b? 928b says the court may determine how much of pledged revenues can be withheld to pay the necessary expenses of a municipality. Well, why would you ever need to do that? It's optional. They only pay what they want to pay. Of course, they could withhold expenses to however much they want to. Why would that be necessary? And by the way, why doesn't that violate Section 305? Isn't that an interference with the property of the Commonwealth? And Section 928a preserves the liens. It goes out of its way to preserve the liens and it's supposed to work together with 922d to ensure that the payments will continue during the pendency of the case. And 922a was necessary because 552a of the code would otherwise cut off liens on future revenues. Everyone agrees with that. The District Court agrees with that. The Oversight Court agrees with that. But 928 does more. It also says that those liens must detach during the entire case. Well, they are stripping those liens off every day when they take our money and they send it up to the Commonwealth. They have thus stripped off the lien because then they take it and they pay vendors. Are we supposed to go out and sue all those vendors? No. They're spending the money. It's gone. Our liens are gone. A direct violation of 928a. And again, why would 928b be necessary if the liens so carefully preserved by 928a could just be stripped off by spending the money? 928b is there to provide the only limited exception to how those pledged revenues can be used other than applying them to the bondholders. Finally, just one point I'd like to make very clear. They say we're trying to take all of HTA's money. It is not remotely true. If the money was simply applied in accordance with state law and the bond resolutions, at the end of the day, they would have $250 million of collateral, free and clear of our liens, to spend however they want to. They have another $220 million of non-pledged revenues. HTA would have over $470 million to spend however they wanted to. It costs, according to their own fiscal plan, $35 million a year to maintain the tolerance. Thank you, Ron. May it please the Court. My name is Mark Harris and I represent the Appalachians. The District Court reached the correct decision, and this Court should affirm, for one simple and straightforward reason. All of the counts of the complaint are premised on the idea that Section 922 and 928 give the claimholders a right to the revenues that HTA has collected. But that claim is not supported by the plain language of Sections 922 and 928, or by the legislative history, or by anything else. My adversary began, or I guess toward the end of his argument, he turned to the plain language, the language of 922. If you look at 922, it's quite clear that it says nothing like what appellants needed to say for their claims to be successful. All 922d says is that when a petition is filed under this chapter, it doesn't operate as a stay of application. In other words, the automatic stay of Section 362 doesn't apply in the one situation that the statute speaks about, which is the application of pledged special revenues. It doesn't say anything about requiring payment. It doesn't say anything about a turnover. It doesn't say anything about the idea that the debtor has to pay the money. It just says the automatic stay is lifted in that one situation. Based on that plain language, they can't succeed because their request for an injunction and their request for declaratory relief is all premised on the idea that there must be some obligation to turn the money over. But there isn't any there. Congress knows very well how to require turnover when it wants to. If you look at Sections 365, D5, or Section 542 of the Code, both of those say plainly language of the sort, trustee shall timely perform all of the obligations, an entity shall pay such a debt. Congress knows how to say pay when it means pay, and it knows how to require it when it wants to require it. There's nothing in 922d that requires payment. The same is true of 928. The plain language of 928 talks about a very specific situation. It says that the pre-petition lien that would be in effect for special revenues remains in effect post-petition. That's all it says. It doesn't talk about lien enforcement. It doesn't require payment. It doesn't say the debtor must pay. What it says is that the lien remains in effect. Now, what I heard Mr. Ellenberg say several times was that, well, these liens are meaningless. Our collateral is being taken unless we're entitled to have the money right now. But they have a remedy if it's true that their collateral is being impaired. The remedy is to bring a motion to lift the stay, to bring a motion for adequate security. That's what you do when collateral is being impaired. In fact, he brought up PREPA at the beginning of his argument. PREPA was a lift-stay motion. That's what it was. That's why the court had the language referring to the idea that there needed to be, creditors needed to be able to collect on their liens. But that's not this case at all. I believe Judge Howard, or perhaps it was Judge Torreya, asked at the beginning of the argument, I think it was Judge Torreya, asked, what statute are you proceeding under? They're proceeding under 922 or 928. They have to establish a cause of action under those two provisions. They don't have a cause of action under those two provisions. And they have a different remedy if they want to be able to show or try to show that their collateral is impaired, they have a way to do that. Now, he also mentioned, again, along those lines about the impairment, said again that there is HTA or the Appellees are taking their collateral. It can't be that there's a requirement under Section 922d to pay all of the money in the excise taxes or of the toll revenue. Because if there were a mandatory payment of special revenue, if that were required, that would be contrary to the whole point of Title III. The point of Title III is to allow restructuring of the debt. It can't be restructured if all of it has to be paid over. That just doesn't make sense. That's the whole framework and the whole posture of where we are. Right now, Mr. Ellenberg mentioned a couple other ideas, which also don't make sense. He said that the payment is required under Puerto Rican law. That can't be a factor here. PROMESA Section 4 preempts all inconsistent law. If it were true that Puerto Rican law controlled here and required payments, it would be to eliminate the entire structure that Congress has set up. To say Puerto Rican law requires payment, requires enforcement of liens, that would eliminate all of Title III. Puerto Rican law requires, as most states in the Commonwealth would require, the payment of all debts. The purpose of Title III is to allow the restructuring of debts. You can't have the restructuring of debts if all debts have to be paid in their full amounts. Let me turn to a section for a moment to the legislative history, because appellants also spend some time on that. First of all, our position is that the legislative history is not necessary to turn to, because the statute is quite clear on its face, both 922 and 928. But if you do turn to it, it says nothing in the legislative history about guaranteeing a stream of revenue or guaranteeing continuity of payments. It doesn't say that. The purpose of 922d is to allow the debtor, where the debtor chooses and needs to, because of the realities of municipal finance, to continue to pay the creditor. That's what the language says in the legislative history that we've cited. If you look to page A553, this is from the Senate report, it refers to the fact that the practical reality of municipal finance might require, in those circumstances, a municipality might well attempt to ignore section 552 and continue to pay the bondholders as originally promised. In other words, there may be pressure, practical pressure, on a municipality to pay according to debt it has to creditors. And in that situation, Congress wanted to make sure that it was clear that those payments could happen. That's the purpose of 922d and 928a. It's to allow the debtor to make those payments where the debtor wants to. Mr. Ellenberg mentioned another argument that's in his briefs, which is that it wouldn't make sense to require that because debtors can always pay, debtors can always pay what they need to pay according to section 305. Why would Congress have needed to spell that out? The reason it needed to spell that out is that there are cases that have gone both ways, which have suggested that sometimes a creditor may be able to accept voluntary payments by a debtor and sometimes it may not. My adversaries cited the Pertuzzo case in the Sixth Circuit, which they say establishes point blank that a creditor can always accept a voluntary payment by a debtor. But it's not that clear. There are other cases. I'll just mention one, a bankruptcy case called Knopfler v. Glidden. This is a Northern District of Illinois bankruptcy case, which suggests that sometimes it's not the case, especially where there's coercion involved. And in fact, Pertuzzo relies on a case called Morgan Guarantee, a Ninth Circuit case from 1986, in which the court said that whether the creditor is allowed to accept payments from the debtor will turn on the circumstances of how the creditor asked for those payments. The point is, Congress could have decided that it wanted to provide clarity to debtors and creditors here, municipal debtors and creditors, that payment in this situation where money has been put in, special revenues have been handed over to a fiscal agent, that that money can be accepted by the creditors. I don't recall whether you cited the Northern District of Illinois case and the Ninth Circuit case that you just mentioned in your briefs. Are they in the brief? No, Your Honor. I can provide that to the court. Would you do that in a 28-J letter? Just give us the cite. Sure, absolutely. There's a few cases like that I will provide to the court. Just to be clear, the Pertuzzo case, the Sixth Circuit case, is mentioned in the appellant's brief. It cites itself and relies on this Morgan Guarantee case, which I'll also provide. But in any event, just to complete the circle on that point, the main consideration is that Congress can pass a statute and does that regularly in order to clarify the law and in order to remove all doubt about how the law should be interpreted. In fact, this Morgan Guarantee case, I'll just mention this quickly because I know it's mentioned here for the first time, it actually explained that Section 362B11, a different provision of the automatic stay, which had to do with the creditor's ability to present a check, that that was a clarifying amendment as well. In other words, Congress passed that, added that section specifically in order to make clear something which was already the case, which was that a creditor can make a presentment. Here too, Congress wanted to make it clear that the creditor could accept payments that the debtor, the municipality, or in this case HTA, wanted to pay in those circumstances. The last point I want to address is Section 305. I think the purpose of 305 is not as narrow as Mr. Ellenberg mentioned. The purpose of it as the statutory, as the legislative history makes clear, is to provide the Commonwealth or the debtor the same breathing spell that any other debtor would have and to work out a restructuring during an emergency. Congress made the finding that there is a fiscal emergency going on right now. That's the purpose of this. It's not to strong arm the debtor into requiring that these payments be made. That would be contrary to 305. It was not an add-on or an exception. It's addressing the very serious constitutional concern over the fact that in the case of a municipality or any other governmental entity, they have rights and other constitutional interests in not being forced by a court to overhaul or control their own finances. The court has no further questions. I would ask for the decision to be affirmed. All right. Mr. Ellenberg, you've reserved some time. Oh, I'm sorry. We have one more. Good afternoon. Good afternoon. Actually, I was only allocated three minutes, but since you went short five, if I could maybe have one minute in addition, that would be great. Invention, nothing gained. Exactly. Good morning. Good afternoon, Your Honors. Luke DePeyer for the Official Committee of Unsecured Creditors in the case. Our intervention today will be very limited, and so we will not repeat the arguments of the Oversight Board regarding 922 and 928, which we support. An argument is really very simple, which is if you're not convinced by those arguments, and the panel has an inclination to reverse, which we don't agree with that, we believe that there's an alternative ground to affirm, and it is the following one, which we raised below, although the court did not address it, but it was argued below before Judge Schwein, and the argument is as follows. And it's very important to understand the facts here. There are two debtors involved here. There's the Commonwealth and there's HTA. Mr. Allenberg always talks about they're taking away my collateral and all that. There's no such thing. What we're dealing with are excised taxes collected by the Commonwealth, always been collected by them, but the Commonwealth has agreed pursuant to a statute to transfer that to HTA. That statute has been modified through a new statute, which is the Moore-Torrent Act in 2015. That statute says we're keeping the money. So when he's saying that they're violating the law of Puerto Rico, that's not true. There is a law in Puerto Rico, the Moore-Torrent Act, that says we're keeping the money at the Commonwealth. And you might say, well, that's not fair. These people relied on that. And the point is they may have claims, meaning HTA may have a claim against the Commonwealth to say, you owe me that excised tax you promised to give me. That's fine. But, Your Honor, that's a pre-petition unsecured claim. So take a number, like all my clients, all the people I represent, and you will be treated as such. The bondholders in HTA have no secured claim, have no ownership rights in these excised tax that are being collected by the Commonwealth. Never had. There's only an agreement or a statute that says we will pay over to HTA what we collect from these excised taxes. And that, Your Honor, we believe, if you look at 922, 928, it talks about the debtors obtaining the special revenues. Which debtor are we talking about here? We're talking about HTA. HTA has not obtained any revenues post-bankruptcy. Special revenues. Has not. Because the Commonwealth is keeping them. So that's a fundamental distinction. And also it avoids... But this issue of the property interests that actually are at stake, wasn't that the subject of the second claim in the complaint? The one that you would say has been waived since it hasn't been briefed on appeal? No, no, I'm not saying that it hasn't been... No, sorry. I didn't say that. What I was saying is that this issue that I'm arguing was raised before Judge Swain in the oral argument, but Judge Swain did not address it in her decision. That's what I meant. I didn't say that it was waived on appeal. In fact, we... No, I'm asking you a different question. Oh, sorry. You ascribe to opposing counsel the position that they have collateral, that they have certain property interests. I thought that the issue of what property interests are at stake was actually the subject of the second claim in the complaint. Well, it may be, Your Honor, but they're doing... Yes, and I've been looking for the arguments on that on appeal and I haven't seen them. So I assume your position is that that's waived. That's correct, Your Honor. But... Thank you. But also in addition, their entire complaint is premise on 922, 928. Those sections do not allow one debtor to go into the other debtor's case to grab assets from other debtors. It only applies into the debtor's case we're dealing with, which is HTA. So you have to look at where's the money. There's no money except for the $69 million, but that's a side issue. But all the money is of the Commonwealth, pursuant to a Commonwealth statute. And as I said, the HTA may have an unsecured prepetition claim for a breach of the statute that says, you will give me those, but that's just an unsecured prepetition claim. That's not their collateral. And even if it's their collateral, it would be the promise to pay that's collateral. And that's just an unsecured promise. That's fundamental, Your Honor. Thank you. If the Court please. Counsel said that we have a remedy and our remedy is to seek relief from the stay. The entire point of 922D is to give us relief from the stay in advance. And again, the legislative history couldn't be clear on this. The automatic stay of Bankruptcy Code 362 is overly broad in Chapter 9, requiring the delay and expense arising from a request for relief from the automatic stay to accomplish what many statutes mandate. The application of pledged revenues after the payment of operating expenses to the payment of secured bonds. The automatic stay should specifically be applicable to application of such revenues. Okay, that's the Senate report at page 11, Joint Appendix 558. Over and over, it is clear we can put our head in the sand and not read the legislative history if we want to. But it is overwhelmingly clear what Congress was trying to do here. They were trying to give us advance relief from the stay in the hope that in the face of that, the payments would continue without interruption. And if they didn't, at a minimum, if we couldn't get an order from this Court, we could go to another Court and enforce our rights under state law. It is just overwhelmingly and unquestionably clear. Are you going after HTA funds? Are we going after HTA funds? Your Honor, we are asking that they be applied in accordance with state law. We are not asking for a turnover. We are not specifically asking for them to be paid to us. We're asking for them to be swept to the fiscal agent who will then fill up certain sinking funds in accordance with state law. It's very well laid out in the PIA opinion, actually, the way the bonds work. And every year, some of that money will be used to pay us and some of it will fall down to the bottom where it can be used by HTA. As I said, they will get over $470 million a year to use, however they wish to use it. Our liens don't attach that money. Our liens only go as far as it takes on an annual basis to fill up the reserve funds. That's what we're asking for. We're asking for the flow of funds. We're asking for funds in the language of 922d to be applied in accordance with state law. What about his argument that they are following state law because of the law that... Yes, thank you for asking that, Your Honor. First of all, Section 303 of PROMESA expressly preempts the Moratorium Act. Congress hated the Moratorium Act. One of the things Congress wanted to do was get rid of what was happening immediately prior to PROMESA being enacted. Moreover, if the Moratorium Act did what he says it did, it would be unconstitutional. They're taking our lien. Your Honor, we have lien rights. They are established by state law. No statute, even the Bankruptcy Code, can preempt that or take it away from us. It just cannot be done, which is another point, Your Honor. If the reading of the District Court and the one urged by the Oversight Board is accepted, Chapter 9 and PROMESA are unconstitutional because our liens are being taken. That is why Section 362 grants adequate protection to lien holders. Everyone recognizes its property. It cannot just be confiscated by statute. You cannot do it after the fact. And I know I'm out of time, Your Honor, but I would just refer you... First of all, Judge Howard, we didn't waive the issues you said we waived. The second count only goes to the Reserve Fund and who has property interest in the Reserve Fund. Our claims are much broader than that. And the issues were not decided below and thus were not ripe for appeal. So we absolutely did not waive the extent of our liens. It hasn't been decided yet. And just if I may, finally, Your Honor, this is the excise tax statute, one of the statutes applicable to HTA relating to motor vehicle revenues. The total proceeds of the $15 increase in fees to be paid for public and private automobile licenses shall be covered into a special deposit in behalf of and for the benefit of the Highways and Transportation Authority of Puerto Rico. The proceeds of said collection shall only be used for the payment of the principal and interest on bonds. 9 LPRA Section 2021. That's not an agreement. That's not a contract for which we have an unsecured claim. That is a statutory lien. It even meets the PIAJE test for a statutory lien because no further action by the Commonwealth is required for that lien to arise. And it exists, it creates a lien right on our part against the Commonwealth. We have separate lien rights that are consensual against HTA. But this is a statutory lien against the Commonwealth itself which blows up Mr. Dupin's entire argument. And by the way, his brief doesn't even talk about the excise tax statute. And finally, Your Honor, we don't just have excise taxes. We have tolls. They are collected directly by HTA. They would be sufficient to pay off most of the 1968 bonds. And they are not touched by the argument that Mr. Dupin made today. Thank you. Thank you all. We will do our best as expeditiously as we can. Safe trip back.